# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CLARIS NICHOLS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 14 C 4185 |
| ) | |
| ILLINOIS DEPARTMENT OF JUVENILE ) | |
| JUSTICE, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Claris Nichols has sued her employer, the Illinois Department of Juvenile Justice (DJJ), alleging harassment on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a). DJJ has moved for summary judgment. For the reasons stated below, the Court grants DJJ's motion.

## Background

The following facts are undisputed. Claris Nichols began her employment with DJJ in 1992. In 2006, she was promoted to the post of shift supervisor, and although her job title was later changed, she has served in this capacity at the Illinois Youth Center in Chicago (IYC-Chicago) ever since. As a supervisor, Nichols oversees the activities of juvenile justice specialists, the staff members who are responsible for ensuring the security of the youth in the facility. Supervisory responsibilities include evaluating these specialists on a yearly basis, overseeing their attendance and adherence to facility rules, and disciplining them.

Nichols alleges that as soon as she was promoted into her supervisory role, members of her team of subordinate staff began to harass her. In particular, she alleges that she was harassed at various times by specialists Paula Roa (female), Andrea Drane (female), Linda Merriweather (female), Monique Jaquez (female), Sandra Binion (female), Linda Wallace (female), and Mark Boykin (male). Nichols's first unpleasant experience was in 2006, when she says Merriweather campaigned to have her coworkers sign a petition against Nichols. Nichols claims to have "no idea" why Merriweather did this, see Def.'s Ex. 2, dkt. no. 40-1, at 27, but she thinks that Merriweather's problem likely stemmed from Nichols's rigid adherence to the rules. *Id.* at 208. Four years later, Nichols began supervising new specialists and had trouble managing them. Specialists Roa, Drane, and Tashia Ayala were apparently difficult to direct, refused to follow Nichols's directions, and were abrasive and rude.

After Nichols explained to them that the perils of their job required her to occasionally be stern with them, Ayala's attitude improved. Roa's and Drane's, however, remained unchanged. In August 2010, Roa submitted a letter and filed numerous incident reports claiming that Nichols was targeting and harassing her. Three months later, Drane did the same, and she specifically claimed that she believed Nichols was harassing her based on her gender. In response to these reports, Vickie Fair, the Director of DJJ's Office of Affirmative Action (OAA), convened a mediation session with Nichols, Roa, and Drane, and in early 2011 Fair initiated a formal investigation into Drane's gender discrimination claim. OAA Officer Tamara Brown conducted this investigation, interviewing all three of Nichols's new subordinates and learning from them that they were displeased with Nichols's managerial style.

2

Over the next few months, Nichols filed written complaints about what she perceived as workplace harassment. She reported that Roa unsuccessfully attempted to convince numerous other specialists to file harassment complaints against her. She also reported hearing a rumor that a member of the nursing staff had heard Drane was threatening to "kick [Nichols's] ass." Def.'s Ex. 15, dkt. no. 40-2, at 82.

OAA ultimately determined that Drane's claims of gender-based discrimination or harassment were unsubstantiated. OAA also recommended that Nichols complete some form of supervisory training. Nichols did so, attending a conflict resolution course provided by the Illinois Department of Human Rights (IDHR). Nichols's (female) supervisor and a male specialist who had also experienced interpersonal conflict at DJJ attended the course with Nichols.

Following up on OAA's investigation, IYC-Chicago's facility investigator conducted another investigation. This investigation included interviews with Drane, Roa, Nichols, and at least four other people. In the resulting report, the investigator wrote that no specialist's claim of harassment could be substantiated but that Nichols's claim that Roa was harassing her could be. Notably, nowhere in this report—and nowhere in any of the incident reports Nichols submitted—was there any indication that this harassment was gender-based. But IYC-Chicago officials did find that Roa was harassing Nichols by soliciting others to file frivolous harassment claims against Nichols. Roa was referred for discipline and scheduled for a review hearing in June 2011, but she resigned from DJJ before any kind of discipline could be imposed.

In early 2011, a male shift supervisor altered a performance evaluation of Ayala that Nichols had completed. Nichols filed an incident report urging her superiors to take

3

action, complaining that this was yet another example of the harassment she felt she was enduring on a daily basis. Nichols believes that the male supervisor who altered the evaluation had a personal relationship with Ayala and altered the document to undermine Nichols and make her look bad.

In November 2011, Nichols filed another incident report detailing problems she was having with one of her subordinates, Sandra Binion. Specifically, Nichols claimed that Binion had told lies about her and that when Binion was assigned to the control room, she would frequently lock Nichols outside for extended periods of time. Superintendent Angela Wartowski spoke with Binion, and Binion stopped locking Nichols out. Wartowski also told Nichols that what Binion was doing was harassing behavior but that it did not constitute harassment under DJJ's administrative directive defining harassment, because Nichols had not contended that Binion's acts were motivated by race, gender, or some other classification. Nichols agrees that Binion's acts did not constitute harassment for this reason. Nichols also reports that she has not had any problems with Binion since Binion was promoted to a supervisory role at IYC-Chicago.

Less than a year later, Nichols began to experience problems with a number of other specialists. Nichols claims that specialist Wallace was insubordinate and filed incident reports against her, which Nichols attributes to Wallace's dislike of her management style. Specialist Boykin apparently filed false incident reports as well, alleging that Nichols had made inappropriate or threatening comments to him. Nichols likewise attributes this to Boykin's distaste for Nichols's demanding management style. In October 2012, Nichols submitted an incident report complaining that during a

4

discussion preceding a social outing, Wallace looked at Nichols and told Merriweather that she would not be drinking at the event because she might get violent. Nichols took this as an attempt to intimidate or threaten Nichols. Wallace submitted an incident report that same day claiming that Nichols was behaving unprofessionally and trying to intimidate her. In response, OAA personnel attended roll call for all shifts a few weeks later in order to explain harassment to the staff and facilitated an informal mediation between Nichols and Wallace.

Nichols submitted another incident report in February 2013 alleging that Wallace had yelled at her and criticized her, telling her to "get her life together." Nichols reported that she felt as though she was being bullied, and she begged management to step in to resolve her issue with Wallace. She submitted another incident report in June 2013 reporting that Wallace had telephoned her and called her "retarded" and that this was creating a hostile work environment.

In early July 2013, specialists Jaquez and Boykin both submitted incident reports alleging that Nichols was mistreating them. Nichols also filed an incident report, claiming that by submitting their incident reports, Boykins and Jaquez were harassing her. At Nichols's request, OAA personnel organized another mediation session with Nichols, Jaquez, and Boykin.

In August 2013, Nichols filed another incident report stating that two youths had informed her that they had heard Boykin and Wallace making derogatory remarks about her. Specifically, Nichols claimed the youths told her they had heard Boykin say that Nichols needed "to show me some love and suck my dick," and that they had heard Wallace refer to Nichols as a "bitch." IYC-Chicago Chief of Security Luther Byrd

investigated the incident and determined that without more evidence than the account given by the youths, there was not sufficient evidence to merit discipline for Boykin or Wallace.  A few days later, Nichols submitted yet another incident report claiming that Wallace had turned on the intercom while Nichols was riding the elevator and had broadcast herself calling Nichols a "fat ass hippo."

Nichols had a few more problems with Wallace.  In March 2014, Nichols submitted an incident report alleging that Wallace stood behind her while they were both speaking with someone on a speaker phone.  Nichols asked Wallace to move multiple times, but Wallace would not move until Nichols ordered her to leave the office (at which point Wallace left the office).  Nichols also stated in the report that this was another example of the harassment that she felt she was exposed to on a daily basis.  In January 2015, Nichols filed an incident report alleging that Wallace had said to her that she did not want to be a "fat ass woman."

Nichols also alleges, albeit unclearly, that DJJ management engaged in harassment on three occasions.  First, in April 2012, Superintendent Wartowski issued Nichols an oral reprimand when she made a staffing mistake and did not properly report it to her superiors.  Second, Nichols received another oral reprimand in November 2013 for assigning three staff to escort youths on a writ instead of abiding by her supervisor's order to assign only one staff escort.  (Nichols admits that she made the mistakes that gave rise to both reprimands.)  Finally, Nichols complains that it constituted harassment for DJJ to deny her request for light duty in December 2013.

Nichols filed a charge of discrimination with the IDHR in March 2013 alleging sex-based harassment and retaliation from February 1, 2013 to March 11, 2013.  She

claimed specifically that DJJ was responsible for harassment in the form of Wallace and Boykin filing false incident reports alleging harassment every time she gave them a directive or inquired about their activities. In late February 2014, Nichols signed a voluntary withdrawal request form with the IDHR and requested a right to sue letter. She received a notice of right to sue in April 2014 and timely filed the present suit alleging claims of gender-based hostile work environment, gender-based differential treatment, and race discrimination. The Court dismissed Nichols's differential treatment and race discrimination claims in October 2014. *See Nichols v. Ill. Dept. of Juvenile Justice*, No. 14 C 4185, dkt. no. 19 (N.D. Ill. Oct. 16, 2014). The parties engaged in discovery, and DJJ now moves for summary judgment.

## Discussion

Summary judgment is proper when the moving party "shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court draws reasonable inferences in favor of the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). The Court's "function is not to weigh the evidence but merely to determine if there is a genuine issue for trial." *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

Courts have recognized a cause of action for gender discrimination under Title VII where a plaintiff shows that she was subjected to a hostile work environment on the

7

basis of her gender.  *See, e.g.*, *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007).  To succeed on a hostile work environment claim, a plaintiff must adduce evidence from which a jury reasonably could conclude that:  "(1) her work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on her [gender]; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability."  *See Porter v. City of Chicago*, 700 F.3d 944, 955 (7th Cir. 2012) (internal quotation marks omitted).  DJJ does not dispute that Nichols's environment offended her, but it contends that Nichols has failed to adduce evidence that can satisfy the other three requirements of a hostile work environment claim.

DJJ begins by arguing that when conducting its analysis at summary judgment, the Court should disregard any incidents involving persons other than Wallace or Boykin because they are outside the scope of the charge Nichols filed with the IDHR.  The Court disagrees.  It is true that a plaintiff fails to exhaust her administrative remedies if her charge and complaint are not reasonably related.  *See Cheek v. Peabody Coal Co.*, 97 F.3d 200, 203 (7th Cir. 1996).  Nichols's charge, however, clearly refers back to the investigative report in which DJJ officials determined that the specialists filing frivolous incident reports against Nichols were harassing her by their conduct.  All of the incidents about which Nichols has complained are reasonably related to her charge.

DJJ also urges the Court to ignore any and all unwelcome conduct that Nichols experienced prior to May 18, 2012 because Title VII requires a plaintiff to file a charge of discrimination within three hundred days "after the alleged unlawful employment practice."  42 U.S.C. § 2000e-5(e)(1).  This argument likewise lacks merit.  DJJ is right that Nichols began describing her treatment as harassment several years before she

8

filed her charge with the IDHR, and she cannot now claim to have been unaware that she was being harassed. *See Minor v. Ivy Tech State Coll.*, 174 F.3d 855, 857 (7th Cir. 1999). But a plaintiff's lack of awareness that she was being harassed is not the only way that otherwise-untimely hostile work environment claims may be preserved. The continuing violation doctrine provides that because "[t]heir very nature involves repeated conduct*," Nat'l RR. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002), hostile work environment claims are timely "as long as '*any* act falls within the statutory time period,' even if the charge encompasses events occurring prior to the statutory time period." *Adams v. City of Indianapolis*, 742 F.3d 720, 730 (7th Cir. 2014) (quoting *Morgan*, 536 U.S. at 120). As explained above, Nichols has alleged that she was harassed consistently and repeatedly by her subordinates and that her employer did nothing to address the problem. Given that DJJ concedes that at least one of the events giving rise to Nichols's claim occurred within the limitations period, the Court may consider all of the events that might cumulatively create the alleged hostile work environment, including the ones that occurred outside the limitations period.

That aside, even considering the entire record of unwelcome behavior about which Nichols complained, she cannot carry her burden at summary judgment. As mentioned above, Nichols claims that DJJ violated Title VII by subjecting her to a hostile work environment. To prevail on a claim of gender-based harassment, Nichols must show that any harassment or unwelcome treatment she endured was "based on her sex" and that "the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere." *Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781, 788 (7th Cir. 2007). For the vast majority of the

unwelcome conduct she experienced, Nichols has failed to produce or point to any evidence that shows that the harassment had anything to do with the fact that she is a woman. And as for the few incidents that could arguably be construed as based on her gender, the evidence cannot support a finding that this harassment was either severe or pervasive.

First, the record contains no evidence of any link to Nichols's gender for most of the harassing behavior about which Nichols complained. To be sure, "unwelcome treatment need not be based on unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature." *Passananti v. Cook Cty.*, 689 F.3d 655, 664 (7th Cir. 2012) (internal quotations omitted). It may also consist of, for example, harassment "in such sex-specific and derogatory terms" that it is apparent the harasser "is motivated by general hostility to the presence of women in the workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). A plaintiff may also satisfy the requirement of proving gender-based harassment by offering "comparative evidence about how the alleged harasser[s] treated members of both sexes in a mixed-sex workplace." *Id.* at 81. But "whatever evidentiary route the plaintiff chooses to follow, he or she must always prove the conduct at issue . . . actually constituted '*discrimina[tion]* . . . because of . . . sex.'" *Id.* at 81 (emphasis and modification in original); *see also Orton-Bell v. State of Indiana*, 759 F.3d 768, 774 (7th Cir. 2014); *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) ("As long as the hostility was not based on a protected characteristic, Title VII is not implicated.").

Nichols points to the following incidents as evidence that her gender motivated

her subordinates' harassment: (1) the numerous false incident reports accusing Nichols herself of gender-based harassment; (2) Wallace's comment insinuating that she could not consume alcohol because she might become violent toward Nichols; (3) Wallace's perceived belligerence when she stood behind Nichols during a conference call and refused to move until Nichols ordered her to leave the room; (4) another staff member's act of altering a performance review Nichols completed; (5) Wallace calling Nichols "retarded" during a phone call; (6) Wallace criticizing Nichols, telling her to "get her life together"; and (7) Binion locking Nichols outside. None of these incidents involved "sex-specific and derogatory terms" that "[made] it clear that the harasser[s were] motivated by general hostility to the presence of women in the workplace." *See Oncale*, 523 U.S. at 80. The same can be said of management's decisions to reprimand Nichols for failing to follow instructions, send her to a dispute resolution course, and deny her light duty request.

In arguing that these incidents involved gender-based harassment, Nichols contends that the record contains evidence that similarly situated male employees were treated differently. She cites three items of evidence. First, she points to her own deposition testimony, in which she stated that "none of the male shift supervisors went through what I went through." Def.'s Ex. 2, dkt. no. 40-1, at 31. Second, she cites DJJ's admission that no men have filed similar claims of gender-based harassment. Third, she contends that Allie Newsome, a retired female supervisor, testified that her management style was different from Nichols's but she was treated poorly anyway. Nichols argues that this shows that it was her gender, not her management style, that motivated her subordinates' behavior.

11

The evidence that Nichols cites would not permit a reasonable jury to find the incidents listed above were gender-based. First, Nichols admitted in her deposition that she never had any opportunity to observe the ways in which her harassers interacted with male shift supervisors. As a result, Nichols's statement that no male shift supervisor experienced the same treatment is, on the record before the Court, entirely speculative, and her testimony on this point is inadmissible due to her lack of personal knowledge. *See* Fed. R. Evid. 602. Second, the fact that no male supervisor has ever filed a claim of harassment would not permit a reasonable jury to find no male supervisor has experienced insubordination in the workplace; it is obvious that misconduct could have occurred without any resulting complaint by the victim. Third, contrary to Nichols's characterization of it, Newsome's testimony actually supports DJJ's argument that Nichols's strict managerial style motivated her subordinates to act obstinately toward her. Newsome testified that she believed it was not her gender, but rather her strict adherence to the rules that caused her supervisees to resent and mistreat her. *See* Def.'s Ex. 4, dkt. no. 40-2, at 19. Newsome did not profess to have any personal knowledge of the way her specialists interacted with any strict male supervisors.

Of all the incidents Nichols cites in support of her hostile work environment claim, there are only three that a reasonable jury could find were based on her gender: (1) the 2013 incident when Nichols heard, secondhand, that Wallace had called her a "bitch" in front of two youths and Boykin had said Nichols needed "to show me some love and suck my dick"; (2) the 2013 incident when Wallace called Nichols a "fat ass hippo" over the intercom; and (3) the incident in early 2015 when Nichols heard Wallace say that

12

she did not want to be a "fat ass woman," presumably in reference to Nichols. Although it is obvious that a jury could reasonably conclude that gender motivated a male employee's comment that Nichols should engage in sexual acts with him, DJJ cites *Yuknis v. First Student, Inc.*, 481 F.3d 552, 555 (7th Cir. 2007), and *Spearman v. Ford Motor Co.*, 231 F.3d 1080 (7th Cir. 2000), for the proposition that "bitch" and "fat ass" are not gender-specific. But the Seventh Circuit has specifically held that "the use of the word [bitch] in the workplace," as with the use of other words that a person in Nichols's position would find severely hostile or abusive, "must be viewed in context" and can amount to gender-based harassment. *Passananti*, 689 F.3d at 666. And that is the case here, or at least a reasonable jury could so find.

That said, no reasonable jury could find that the mistreatment represented by these incidents reached the level of severity or pervasiveness required to sustain a hostile work environment claim. Nichols argues that the evidence shows that the harassment was severe because she needed to seek counseling due to the stress she suffered from the experience, and that the harassment was pervasive because it stretched over many years. But Nichols's subjective reaction to the mistreatment she cites is not enough; to be actionable, a hostile work environment must be both subjectively and objectively offensive. *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). In determining whether harassment is severe or pervasive, courts consider "the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *EEOC v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 432 (7th Cir. 2012)

(internal quotations omitted). "The occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers would be neither pervasive nor offensive enough to be actionable." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 977 (7th Cir. 2004).

The Seventh Circuit has held more severe and pervasive harassment insufficient to support liability under Title VII. *See, e.g.*, *Scruggs*, 587 F.3d at 841 (supervisor's inappropriate comments to female employee, including commenting to her that she "was 'made for the back seat of a car' and looked like a 'dyke,'" were not severe or pervasive); *Whittaker v. N. Ill. Univ.*, 424 F.3d 640 (7th Cir. 2005) (no liability where supervisor made one suggestive remark to the plaintiff while also calling her numerous vile and offensive names when she was not present); *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (plaintiff's complaint of eight gender-related comments, including that "the only valuable thing to a woman is that she has breasts and a vagina," was insufficient to create a hostile work environment). *Compare with, e.g.*, *Boumehdi*, 489 F.3d at 786 (summary judgment not proper where evidence showed employer made "at least eighteen sex-based comments" to female employee over ten months, including comments about not believing women belonged in the workplace and comments about how the employee should dress or sit); *Gentry v. Exp. Packaging Co.*, 238 F.3d 842 (7th Cir. 2001) (harassment was severe and pervasive where male supervisor frequently made sexually suggestive remarks to female subordinate and made unwanted physical contact with her almost sixty times in four months); *Passananti*, 689 F.3d at 669 (evidence that an employee was called "bitch," "lying bitch," and "fucking bitch" to her face "nearly constantly for several years" could

14

support a finding of severe and/or pervasive harassment).

The three incidents the Court has referenced were, even when considered together, insufficiently severe, nor did they occur with the frequency needed to constitute pervasive gender-based harassment. Rather, they amounted to isolated offensive utterances. Though such conduct should not occur in the workplace, no reasonable jury could find that it constituted actionable gender-based harassment.

Because the Court grants DJJ's motion on this basis, it need not address DJJ's argument that the evidence does not provide a basis for employer liability.

## Conclusion

For the foregoing reasons, the Court grants defendant's motion for summary judgment [dkt. no. 38] and directs the Clerk to enter judgment in favor of the defendant.

```
                                    _____
                                           MATTHEW F. KENNELLY
                                          United States District Judge
```

Date: January 11, 2016